UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THOMAS MILLER SPECIALTY OFFSHORE, individually and on behalf of Certain Underwriters Subscribing to Policy UMR B0180ME2017007,<br><br>                          Plaintiff,<br><br>        v.<br><br>ELECTRON HYDRO, LLC et al.,<br><br>                          Defendants. | CASE NO. 2:22-cv-00540-LK<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. Nos. 67, 70. For the following reasons, the Court denies Plaintiff Thomas Miller Specialty Offshore's motion for summary judgment and grants in part and denies in part Defendants Electron Hydro and Thom Fischer's motion for summary judgment.

## I.    BACKGROUND

### A.    The Parties and the Policy

Thomas Miller is a private limited company incorporated in the United Kingdom with its

principal place of business in London, England. Dkt. No. 59 at 1. It is the slip leader subscribing to Policy UMR B0180ME2017007 (the "Policy") and is consequently authorized by the underwriters subscribing to the Policy to bring and resolve claims under the Policy. *Id.* at 2, 46.[1] The Policy includes a "Defence Provisions Endorsement" that imposes a duty to defend lawsuits against the insured subject to a $100,000 deductible. *Id.* at 23–24.

Defendant Electron Hydro, LLC is a Washington corporation that is a named insured under the Policy. Dkt. No. 1 at 2; *see also* Dkt. No. 59 at 16. Electron Hydro owns and operates a hydroelectric facility on the Puyallup River approximately 25 miles southeast of Tacoma, Washington (the "Facility"). Dkt. No. 71 at 2. The Facility consists of a wood flow diversion structure, a spillway, a water intake, and an approximately 10-mile-long flume that conveys diverted water to the facility's powerhouse for electricity generation. *Id.* Electron Hydro's members are citizens of the State of Washington. *Id.* Defendant Thom A. Fischer is a citizen of Washington and manager of Electron Hydro, and therefore is considered a named insured under the Policy. Dkt. No. 59 at 2, 34 (specifying that managers of an insured limited liability company are also insured with respect to their duties as managers); *see also* Dkt. No. 65 at 2.

Thomas Miller issued the Policy to various entities, including Defendants, for the period of June 24, 2020 to June 24, 2021. Dkt. No. 59 at 16. Under the Policy, the underwriters agreed to "pay those sums that the insured becomes legally obligated by Washington Law to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.* at 51. The Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* at 63. "Property damage" includes "[p]hysical injury to tangible property, including all resulting loss of use of that property" and

---

[1] Because Thomas Miller is the slip leader subscribing to the Policy, the Court's references to Thomas Miller's obligations under the Policy include the other subscribing underwriters' obligations under the Policy as well.

"[l]oss of use of tangible property that is not physically injured." *Id.* at 65–66. The general term "damages," however, is not defined. *See id.* at 51–84; *id.* at 63–66 (definitions).

Under the Policy, underwriters "have the right and duty to defend the insured against any 'suit' seeking . . . damages," but "have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage to which th[e] insurance does not apply." *Id.* at 51. The Policy contains a Pollution Endorsement, which excludes from coverage:

1) Bodily injury or property damage arising out of the actual or threatened discharge, dispersal, seepage, release or escape of pollutants; [and]

2) Any loss, cost or expense, including but not limited to costs of investigation or attorney's fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

*Id.* at 69.[2] "Pollutants" are defined by the Policy to include "any solid, liquid, gaseous or thermal contaminant." *Id.* The Pollution Endorsement further provides, as relevant here, that the "exclusion does not apply to bodily injury or property damage arising out of . . . [a]ny discharge, dispersal, seepage, migration, release or escape of pollutants" that meets five conditions:

a. It was accidental and neither expected nor intended by the insured. . . . ; and

b. It was demonstrable as having commenced on a specific date during the term of this policy; and

c. Its commencement became known to the named insured within 20 calendar days; and

d. Its commencement was reported in writing to [the named insured] within 80 calendar days of becoming known to the finance department; and

e. Reasonable effort was expended by the named insured to terminate the situation as soon as conditions permitted.

*Id.* at 69. However, if these exceptions were to apply, the Policy specifies that "there is no coverage

---

[2] The Pollution Endorsement replaced the Policy's original pollution exclusion in its entirety. *Id.* at 69; *see also id.* at 53–54 (original pollution exclusion).

with respect to" the following:

    a.  Any site or location principally used by the insured, or by others on the insured's behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material;

    b.  Any fines or penalties;

    c.  Any clean up costs ordered by . . . any federal, state, or local governmental authority . . . ;

    d.  Acid rain; [or]

    e.  Clean up, removal, containment, treatment, detoxification or neutralization of pollutants situated on premises the insured owns, rents or occupies at the time of the actual discharge, dispersal, seepage, migration, release or escape of said pollutants.

*Id.* at 69–70.

## B.    The Underlying Litigation

Beginning in late 2019, Electron Hydro began planning for a Diversion Repair and Spillway Replacement Project (the "Project"), which involved repairing the Facility's wooden diversion structure, replacing the spillway, and reinforcing existing shoreline protection infrastructure. Dkt. No. 71 at 2. Between July 20 and 27, 2020, as part of the Project, Electron Hydro constructed a bypass channel to divert water away from the work area adjacent to the Facility. *Id.* Electron Hydro then lined the bypass channel with high density polyethylene ("HDPE") liner, and set geotextile fabric, artificial grass turf, and crumb rubber underneath the HDPE liner in an effort to prevent any rough material in the bypass channel from damaging the HDPE liner. *Id.*

On July 29, 2020, shortly after diversions into the temporary spillway began, the HDPE liner unexpectedly tore for an unknown reason. *Id.* at 2–3. The water flowing through the spillway came into contact with the substrate under the HDPE liner, causing the water to carry geotextile fabric, crumb rubber, artificial turf, and HDPE downstream. *Id.* at 2.

On November 25, 2020, the United States filed a complaint in *United States v. Electron Hydro, LLC*, No. 2:20-cv-01746-JCC (the "Underlying Litigation") under the Clean Water Act ("CWA") against Defendants, alleging that Defendants (1) violated Section 301(a) of the CWA for discharging waste field turf and its component crumb rubber, as well as other rock, gravel, and/or other fill material, into the Puyallup River, Dkt. No. 69 at 30–32, 34–35, (2) violated the conditions of their Section 404 permits by placing waste field turf and component crumb rubber in the bypass channel, *id.* at 32–33, and (3) violated various conditions of Electron Hydro's Section 202 permit, *id.* at 33–34.

On May 26, 2021, two nonprofit corporations—Citizens for a Healthy Bay and Puget Soundkeeper Alliance (together, the "Conservation Groups")—intervened in the United States' action.[3] Their complaint brought similar Section 301(a) claims, Dkt. No. 69 at 101–03, but also asserted violations of Section 401 of the CWA for violating CWA permits specific to construction activities at the Facility and by failing to apply for and obtain a site-specific Section 401 certification, *id.* at 101. On September 14, 2021, the Puyallup Tribe of Indians, a federally recognized Indian tribe, also intervened in the United States' action, alleging similar Section 301(a), 401, 402, and 404 violations, *id.* at 39–75.

## C.    Thomas Miller's Investigation

On October 8, 2020, Thomas Miller received notice from third party Howden Insurance Brokers—the London-based agent for Electron Hydro and other insureds under the Policy—of a "contamination" event in the Puyallup River. Dkt. No. 74 at 2; *see also id.* at 12.[4] Howden attached

---

[3] Prior to their intervention in the United States' suit, the Conservation Groups filed a separate action against Electron Hydro alleging similar violations under the CWA. *See Citizens for a Healthy Bay v. Electron Hydro, LLC*, No. 2:21-cv-05171-JCC, Dkt. No. 1 (W.D. Wash. Mar. 9, 2021). This action was consolidated with the United States' suit on April 28, 2021 before the Conservation Groups intervened in the United States' suit. *See Citizens for a Healthy Bay v. Electron Hydro, LLC*, No. 2:21-cv-05171-JCC, Dkt. No. 14 (W.D. Wash. Apr. 28, 2021); *United States v. Electron Hydro, LLC*, No. 2:20-cv-01746-JCC, Dkt. No. 17 (W.D. Wash. Apr. 28, 2021).

[4] Thomas Miller represents that "[i]t is customary and expected for the insured's London broker to act as agent for a

to its notice three letters—one each from the Puyallup Tribe, the Washington Attorney General's Office Environmental Protection Division, and Puget Sound Energy, Inc.—that threatened to file suit against Electron Hydro pursuant the CWA due to the alleged contamination event. Dkt. No. 74 at 2, 12; *see also id.* at 15, 24 (letter from Washington Attorney General's Office), 16–23 (letter from the Puyallup Tribe), 25–26 (letter from Puget Sound Energy).

On October 12, 2020, Thomas Miller provided a written response to Howden, acknowledging receipt of the claim and recommending that Electron Hydro retain counsel. *Id.* at 2; *see also id.* at 10–11. Thomas Miller specifically recommended that Electron Hydro appoint the law firm Schwabe, Williamson & Wyatt, P.C. ("Schwabe") as counsel in the matter and offered to appoint Schwabe on Electron Hydro's behalf. *Id.* at 2; *see also id.* at 10. Thomas Miller also asked Howden to provide additional information on the claims, including what steps Electron Hydro had taken to rectify the matter, whether a pollution response plan was in place, whether there was any indication of a reserve value, and why there was a delay in notifying Thomas Miller of the matter when Electron Hydro was aware of it as early as August 2020. *Id.* at 2; *see also id.* at 10–11. On October 16, 2020, Howden responded that Electron Hydro had already retained a different law firm—Nossaman LLP—as counsel but did not yet have any information regarding Thomas Miller's other inquiries. *Id.* at 3; *see also id.* at 10.

On October 27, 2020, Howden emailed Thomas Miller, indicating that Electron Hydro was considering Thomas Miller's recommendation to appoint Schwabe as defense counsel and requesting information from Thomas Miller regarding Schwabe's qualifications in handling environmental matters, which Thomas Miller provided on November 2, 2020. *Id.* at 28–29, 32. Thomas Miller followed up later that day requesting any permits and licenses for the installation

---

foreign-based insured like Electron Hydro[.]" *Id.* Electron Hydro does not dispute this representation. *See generally* Dkt. Nos. 70, 76.

of artificial turf at the Facility, as well as any other work performed at the Facility. *Id.* at 32. Howden acknowledged Thomas Miller's request on the same day. *Id.* at 38.

Two weeks later, on November 16, 2020, Thomas Miller followed up with Howden, inquiring whether it had an "updated position on counsel" and whether "there [had] been any progress on receiving any permits/licensing documents [that] were in place to state the approval of the turf[.]" *Id.* at 3; *see also id.* at 37. Howden responded that Electron Hydro had not yet made a decision on counsel and promised to "provide further updates as they became available." *Id.* at 3–4; *see also id.* at 48–49.

On December 11, 2020, Howden notified Thomas Miller that the United States had filed a lawsuit against Electron Hydro. *Id.* at 4. Howden also informed Thomas Miller that Electron Hydro did not want to be represented by a law firm that had represented any local Tribes and therefore was formally requesting Thomas Miller's consent to have Nossaman continue to defend the lawsuits. *Id.* Thomas Miller and Howden discussed the issues on a December 18, 2020 conference call, but did not reach a resolution. *Id.*

On January 6, 2021, Howden notified Thomas Miller that the Puyallup Tribe had filed suit. *Id.* He also pressed Thomas Miller to agree to consent to Electron Hydro's pre-retained counsel (Nossaman), indicating for the first time that "the insured are prepared to accept funding the differential [in hourly rates] in order to overcome the current disagreement." *Id.*

On January 18, 2021, Thomas Miller, Electron Hydro, and Howden convened on a conference call. *Id.* at 4, 64–65. On this call, Thomas Miller indicated that it wished to work with Electron Hydro "to ensure that the matter is handled in the best interest of the insured [and] insurers," and further pushed for Electron Hydro to consider using Schwabe for lead counsel despite its preference for Nossaman. *Id.* at 4, 64. On February 2, 2021, Electron Hydro responded that it spoke with Schwabe and concluded that, because its "current strategy is to settle the court

cases," it still needed to have Nossaman as lead counsel and would retain Schwabe as a supporting role—a role which would "potentially increase if [and] when discovery continues." *Id.* at 4, 65. Howden requested that Thomas Miller confirm that this counsel arrangement was acceptable and consequently agree to pay the respective fees incurred, including any fees "over [and] above the insured's deductible." *Id.* at 65. A week later, on February 9, 2021, Thomas Miller consented to Electron Hydro's retention of Nossaman as lead counsel on the litigation and advised Howden that it would be separately retaining Schwabe to provide advice on "coverage and strategy of the case moving forwards, should [it] wish to obtain [Schwabe's] clarification on any aspect of the claims raised." *Id.* at 4–5, 62. On the same day, Thomas Miller indicated that it "look[ed] forward to receiving updated communication as soon as available as it w[ould soon] be a year" since Howden's original notification. *Id.* at 5, 61. Howden responded with assurances that it would provide "all defense reports as they are issued by Nossaman, in order to keep [Thomas Miller] fully updated." *Id.*

Thomas Miller represents that it made "multiple requests for information and status updates on the claims" over the following months, but Nossaman did not provide any updates to Thomas Miller "or any of the other information Thomas Miller requested" until July 9, 2021, when it provided "a 12-page summary letter from counsel without any further documentation." *Id.* at 5. This letter concluded that "the cases related to Electron's spillway replacement project are in early stages and none of the plaintiffs have made specific demands for civil penalties or injunctive relief." *Id.*

On October 19, 2021, Howden sent Thomas Miller a message requesting reimbursement for legal defense invoices amounting to $318,434.52 (after deduction of non-reimbursable expenses and a $100,000 deductible). *Id.* at 5, 78; *see also id.* at 75 (spreadsheet summarizing litigation expenses). On October 25, 2021, Thomas Miller confirmed receipt of the legal bills, but

1    explained that in the absence of "advices and reports" from counsel, it was not in a position to

2    comment on the past year of invoices provided, and sought "clarification as to why the advices

3    [referenced in the invoices] have not [been] provided to Underwriters for their

4    comment/consideration to date[.]" *Id.* at 5–6, 77. Thomas Miller avers that it never received the

5    requested advices. *Id.* at 6.

6         A little over a month later, on November 23, 2021, Thomas Miller received an update on

7    the litigation, which consisted of a four-page letter from counsel summarizing the status of the

8    litigation, noting that the cases "are in early stages and none of the plaintiffs have made specific

9    demands for civil penalties or injunctive relief." *Id.* at 6; *see also* Dkt. No. 72-12 at 3. This update

10   did not include any of the underlying advices or documentation that Thomas Miller had previously

11   requested. Dkt. No. 74 at 6.

12        On December 3, 2021, Thomas Miller participated in a conference call with Howden, in

13   which they discussed Thomas Miller's reservation of rights with respect to the "lack of claims for

14   damages for property damage and the pollution exclusion and the status of payment on the

15   Nossaman invoices[.]" *Id.*; *see also* Dkt. No. 72-12 at 2. Thomas Miller and Howden also discussed

16   the lack of information from Electron Hydro and its chosen counsel regarding the claims. Dkt. No.

17   74 at 6. On January 6, 2022, Thomas Miller informed Howden that it "had advised [Schwabe] of

18   this decision" and was "currently waiting on their formal wording." Dkt. No. 72-12 at 2.

19        On January 17, 2022, Thomas Miller once again wrote to Howden stressing the need for

20   "greater detail and clarity on what actions" Nossaman had taken apart from the reports that had

21   been provided to Thomas Miller. Dkt. No. 74 at 81. In the same correspondence, Thomas Miller

22   requested copies of all reports issued to Electron Hydro, answers to pleadings, and litigation

23   strategies that had been formulated and provided to Electron Hydro, explaining that "there is

24

1    reference to same within the invoices but [Thomas Miller] ha[s] not been provided with the same

2    for consideration/comment." *Id.*

3        Thomas Miller paid its share of Nossaman's first round of invoices on February 17, 2022.

4    *Id.* at 6–7. On the same day, Electron Hydro sent another round of Nossaman's invoices to Thomas

5    Miller for reimbursement. *Id.* at 7.

6    **D.    Thomas Miller's Reservation of Rights and Initiation of Lawsuit**

7        On March 11, 2022, Thomas Miller sent Electron Hydro a letter agreeing to "provide

8    Electron Hydro with a defense against the [Underlying Litigation]," but "subject to a full

9    reservation of rights." Dkt. No. 68 at 4; Dkt. No. 72-13 at 2. Thomas Miller "concluded that the

10    Policy might not provide coverage, and accordingly, there might be no duty [on Thomas Miller's

11    part] to defend or indemnify" Electron Hydro. Dkt. No. 68 at 13; Dkt. No. 72-13 at 11. The letter

12    asserted two primary grounds for disputing Electron Hydro's right to coverage: (1) that plaintiffs

13    in the Underlying Litigation "are not seeking 'damages because of 'bodily injury' or 'property

14    damage,''" and instead "seek civil penalties, declaratory judgment, injunctive relief, and orders of

15    compliance," and (2) that the pollution exception otherwise bars coverage. Dkt. No. 68 at 11–13;

16    Dkt. No. 72-13 at 9–11.[5] Defendants did not respond to, object to, or oppose Thomas Miller's

17    positions in the letter at that time. *See* Dkt. No. 68 at 16.

18        Four weeks after sending the reservation of rights letter, Thomas Miller paid Nossaman's

19    second round of defense invoices. Dkt. No. 74 at 7.

20

21

22    [5] The March 2022 letter maintained that the underwriters would "not provide a defense to or indemnify" Fischer. *Id.*
23    at 2–3. After Defendants filed their initial answer and counterclaim for declaratory judgment on behalf of both Electron
     Hydro and Fischer, Dkt. No. 7, and after learning from Defendants that Fischer was only a manager of Electron Hydro
     as opposed to a member-manager, Thomas Miller agreed in a supplemental September 2022 letter to defend Fischer
24    in the Underlying Litigation as well, subject to the same reservation of rights indicated in the March 2022 letter, Dkt.
     No. 68 at 16–17.

Thomas Miller proceeded to file the instant action against Electron Hydro, seeking a declaratory judgment that it has "no duty to defend or indemnify Electron Hydro and . . . Fischer" against the claims in the Underlying Litigation. Dkt. No. 59 at 12.[6] Defendants filed their answer, raising among other affirmative defenses coverage by estoppel due to Thomas Miller's "breach . . . of the duty of good faith and fair dealing and/or common law insurance bad faith toward [Defendants]." Dkt. No. 65 at 11–12. Defendants also filed a counterclaim against Thomas Miller for a declaration that Thomas Miller is obligated to fully defend both Electron Hydro and Fischer in the Underlying Litigation, "including all necessary attorney's fees and defense costs, any liabilities ultimately imposed on Electron Hydro and/or Mr. Fischer, the cost of any settlement payments or compromises, and the cost of complying with any injunctive relief or non-monetary settlements or compromises entered or reached in the Underlying Lawsuit." *Id.* at 13–14.

### E.    Consent Decree

On November 20, 2023, the United States and Defendants lodged a proposed consent decree ("Consent Decree") in the Underlying Litigation that would settle the United States' claims against Defendants. Dkt. No. 72-16; *see also United States v. Electron Hydro, LLC*, No. 2:20-cv-01746-JCC, Dkt. No. 154 at 1 (W.D. Wash. Nov. 20, 2023).[7] In addition to requiring Defendants

---

[6] This matter suffered from several procedural setbacks. Thomas Miller originally filed its complaint on April 22, 2022. Dkt. No. 1. On July 22, 2022, Electron Hydro answered the complaint and counterclaimed for declaratory judgment on behalf of both it and Fischer. Dkt. No. 7 at 11–13. After the parties filed their initial cross-motions for summary judgment, the Court observed that Fischer was not properly joined in the action and did not move to intervene; therefore, the counterclaims involving him constituted impermissible third-party claims. Dkt. No. 46 at 5–7. The parties filed a stipulated motion to allow Thomas Miller leave to amend its complaint to cure jurisdictional defects and add Fischer as a party defendant, Dkt. No. 50 at 4; Dkt. No. 57 at 1; *see also* Dkt. No. 46 at 3–5, which the Court granted, Dkt. No. 55 at 4; Dkt. No. 58. Thomas Miller proceeded to file an amended complaint seeking the same declaratory relief as before, but this time against both Electron Hydro and Fischer. Dkt. No. 59.

[7] The Court entered a separate consent decree earlier in the Underlying Litigation on May 20, 2022 that resolved the previously independent claims of the Conservation Groups. Dkt. No. 69 at 2, 4–12; *see also United States v. Electron Hydro, LLC*, No. 2:20-cv-01746-JCC, Dkt. Nos. 102–103 (W.D. Wash. May 20, 2022). This consent decree, however, neither settled nor resolved the Conservation Groups' substantive claims as plaintiff-intervenors in the United States' case against Electron Hydro. *United States v. Electron Hydro, LLC*, No. 2:20-cv-01746-JCC, Dkt. No. 75 at 2 (W.D. Wash. Mar. 3, 2022).

1   to comply with the CWA, all permits obtained pursuant under the CWA, and all applicable law,

2   the Consent Decree imposed several obligations on Defendants. First, Defendants would be

3   required to pay a $1.025 million civil penalty. Dkt. No. 72-16 at 8–9. Second, they would be

4   required to place a conservation easement on a 72-acre portion of Electron Hydro's property along

5   the Puyallup River. *See id.* at 10–11; *see also id.* at 50–54 (proposed declaration of restrictive deed

6   for conservation). The conservation easement would require Defendants to ensure that all features

7   on that parcel "including air space and subsurface, will be preserved in their natural condition[.]"

8   *Id.* at 10. Defendants would also be required to "make reasonable and good faith efforts to

9   cooperate with any organization that seeks to conduct watershed restoration, fish recovery, and/or

10  fish protection projects and associated activities" on the parcel. *Id.* at 11. Third, Defendants would

11  be required to implement a turf removal and recovery program, requiring routine and semi-annual

12  monitoring of the affected portion of the river, aerial surveys of the river, and compliance with

13  strict record-keeping and reporting requirements. *Id.* at 10, 40–44. And fourth, Defendants would

14  be required to obtain all necessary permits for the temporary rock spillway at the Facility, including

15  without limitation a CWA Section 404 permit. *Id.* at 11, 59–61.

16      On March 29, 2024, the United States moved for entry of a marginally modified version of

17  the Consent Decree in the Underlying Litigation. *See United States v. Electron Hydro, LLC*, No.

18  2:20-cv-01746-JCC, Dkt. No. 161 (W.D. Wash. Mar. 29, 2024). In July 2024, the Court granted

19  the United States' motion and entered the modified Consent Decree. *Id.*, Dkt. Nos. 174–75 (W.D.

20  Wash.). Both the Puyallup Tribe and Conservation Groups subsequently stipulated to dismissal of

21  their claims as plaintiff-intervenors to the United States' suit. *Id.*, Dkt. Nos. 177–78 (W.D. Wash.).

22              **II.   DISCUSSION**

23      On February 23, 2024, Thomas Miller moved for summary judgment, seeking a declaratory

24  judgment from this Court that there is no coverage for the Underlying Litigation under the Policy.

1   Dkt. No. 67 at 2. Thomas Miller specifically contends that "(1) the claims in the underlying lawsuit

2   against the defendants do not seek compensatory damages for bodily injury or property damage,

3   (2) cleanup costs are excluded from coverage, (3) fines and penalties are excluded from coverage,

4   and (4) there is no coverage for claims arising from any site that is used from the handling, storage,

5   or disposal of waste material." *Id.*

6          Defendants filed a response and cross-motion for summary judgment seeking a declaration

7   that Thomas Miller is obligated to defend and indemnify Defendants in the Underlying Litigation,

8   in whole or in part. Dkt. No. 70 at 2. Defendants contend that they are entitled to coverage by

9   estoppel due to Thomas Miller's "gross violation of Washington insurance law" and "bad faith"

10  in handling Defendants' claim. *Id.* They also contend that, even if they are not entitled to coverage

11  by estoppel, the claims in the Underlying Litigation are nonetheless covered by the Policy, either

12  pursuant to Washington's "efficient proximate cause" rule or due to the "compensatory mitigation"

13  remedies contemplated by the Consent Decree. *Id.* at 2–3. Defendants finally request that, "[i]f

14  nothing else, the Court should resolve this dispute by issuing a declaratory judgment providing the

15  parties with guidance about how [Thomas Miller's] policy should apply to any underlying

16  judgment." *Id.* at 3.

17  **A.    Jurisdiction**

18         Defendants' complaint seeks declaratory judgment under 28 U.S.C. §§ 2201 and 2022 to

19  determine whether Thomas Miller has a duty to defend and indemnify Defendants, which is an

20  actual controversy between the parties. Dkt. No. 59 at 2–3. The complaint also alleges that Thomas

21  Miller is a United Kingdom citizen, Defendants are Washington citizens, and the amount in

22  controversy exceeds $75,000. *Id.* at 2; *see also* Dkt. No. 65 at 2. Based on those allegations and

23  the supporting evidence in the record, this Court has subject matter jurisdiction over this action

24  pursuant to 28 U.S.C. § 1332(a).

1    **B.      Applicable Law and Legal Standard**

2           Because this Court sits in diversity jurisdiction, it will apply Washington state substantive

3    law and federal procedural law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427

4    (1996).[8]

5           Summary judgment is appropriate only when "the movant shows that there is no genuine

6    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

7    Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

8    stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

9    evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

10   sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

11   resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

12   the facts specifically averred by that party contradict facts specifically averred by the movant, the

13   motion must be denied." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990).

14          The Court will, however, enter summary judgment "against a party who fails to make a

15   showing sufficient to establish the existence of an element essential to that party's case, and on

16   which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

17   (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must

18   come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

19

20   _____

[8] The Policy includes a Choice of Law and Jurisdiction clause stating that it "shall be subject to the Law and Practice
21   of New York[.]" Dkt. No. 59 at 19. However, as the parties pointed out in their supplemental briefing, Dkt. No. 79 at
1; Dkt. No. 80 at 2, Dkt. No. 81 at 2–3, Washington law renders this choice of law provision inapplicable. *See* Wash.
22   Rev. Code § 48.18.200(1)(a) (providing that "no insurance contract delivered or issued for delivery in [Washington]
and covering subjects located, resident, or to be performed in [Washington], shall contain any condition, stipulation,
23   or agreement . . . requiring it to be construed according to the laws of any other state"); *id.* § 48.18.200(2) ("Any such
condition, stipulation, or agreement in violation of this section shall be void, but such voiding shall not affect the
validity of the other provisions of the contract."); *see also Wash. Cities Ins. Auth. v. Ironshore Indem., Inc.*, 443 F.
Supp. 3d 1218, 1223 (W.D. Wash. 2020) (voiding choice-of-law provision pursuant to Wash. Rev. Code § 48.18.200).
24   The parties therefore agree that Washington law applies. Dkt. No. 79 at 1.

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt

is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89.

Summary judgment in an insurance coverage case is warranted when "(1) there are no facts

in dispute and (2) coverage depends solely on the language of the insurance policy." *Akins Foods,*

*Inc. v. Am. & Foreign Ins. Co.*, No. C04-2195-JLR, 2005 WL 2090678, at *2 (W.D. Wash. Aug.

30, 2005) (citing *Stouffer & Knight v. Cont'l Cas. Co.*, 982 P.2d 105, 109 (Wash. Ct. App. 1999)).

Under Washington law, "[i]nterpretation or construction of an insurance contract is a question of

law and may properly be determined on motion for summary judgment." *Wampold v. Safeco Ins.*

*Co. of Am.*, 409 F. Supp. 3d 962, 967 (W.D. Wash. 2019) (quoting *Gerken v. Mut. of Enumclaw*

*Ins. Co.*, 872 P.2d 1108, 1112 (Wash. Ct. App. 1994)).

Determining whether coverage exists under a policy is a two-step process. "The burden

first falls on the insured to show its loss is within the scope of the policy's insured losses. If such

a showing has been made, the insurer can nevertheless avoid liability by showing the loss is

excluded by specific policy language." *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 329 (Wash. 2002)

(internal citation omitted). In the insurance context, the duty to defend is broader than the duty to

indemnify. *Woo v. Fireman's Fund Ins. Co.*, 164 P.3d 454, 459 (Wash. 2007). "An insurance

company has the duty to indemnify if the insurance policy *actually* covers the insured, while the

duty to defend arises if the insurance policy *conceivably* covers the insured." *Robbins v. Mason*

*Cnty. Title Ins. Co.*, 462 P.3d 430, 435 (Wash. 2020).

"The criteria for interpreting insurance contracts in Washington are well settled." *Quadrant*

*Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005). The "primary goal" is to ascertain

and give effect to the parties' intent at the time of the policy's execution—not "the interpretations

the parties are advocating at the time of the litigation." *Int'l Marine Underwriters v. ABCD Marine,*

*LLC*, 313 P.3d 395, 399–400 (Wash. 2013). In doing so, the Court "construe[s the] insurance

polic[y] as a whole and give[s] the language a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 516 P.3d 796, 800 (Wash. 2022) (cleaned up); *Certification from U.S. Dist. Ct. ex rel. W. Dist. of Wash. (Kroeber) v. GEICO Ins. Co.*, 366 P.3d 1237, 1239 (Wash. 2016) ("This court views an insurance contract in its entirety, does not interpret a phrase in isolation, and gives effect to each provision."). Undefined terms are thus given "their popular and ordinary meaning[.]" *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 601 (Wash. 2016). But when the policy expressly defines a term, the Court is bound by that definition. *Overton*, 38 P.3d at 327.

Ambiguities in the policy are strictly construed against the insurer. *Findlay v. United Pac. Ins. Co.*, 917 P.2d 116, 119 (Wash. 1996). This rule "applies with added force to exclusionary clauses," *id.*; policy exclusions are "most strictly construed against the insurer," *Am. Best Food, Inc. v. Alea London, Ltd.*, 229 P.3d 693, 697 (Wash. 2010) (cleaned up). When determining whether ambiguity exists, the Court—as is the case generally—views the policy language as it would be read by the average insurance purchaser. *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246–47 (Wash. 1997). The Washington Supreme Court has repeatedly emphasized that policy language is ambiguous only "if, on its face, it is fairly susceptible to two different but reasonable interpretations." *Seattle Tunnel Partners*, 516 P.3d at 800. Where, however, the policy language "is clear and unambiguous, the court must enforce it as written and may not modify the contract or create ambiguity where none exists." *Transcon. Ins. Co. v. Wash. Pub. Utilities Dists.' Util. Sys.*, 760 P.2d 337, 340 (Wash. 1988). "[W]here multiple reasonable definitions of an undefined term in an insurance policy exist . . . courts adopt the definition that most favors the insured." *Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515 P.3d 525, 531 (Wash. 2022) (quoting *McLaughlin v. Travelers Com. Ins. Co.*, 476 P.3d 1032, 1037 (Wash. 2020).

C.    **Duty to Defend**

"The duty to defend arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." *Am. Best Food*, 229 P.3d at 696 (cleaned up). "An insurer is relieved of the duty to defend only if the policy clearly does not cover the claim," and "[i]f the complaint is ambiguous, it will be liberally construed in favor of triggering the insurer's duty to defend." *Robbins*, 462 P.3d at 435 (quoting *Truck Ins. Exch. v. VanPort Homes, Inc.*, 58 P.3d 276 (2002)).

As detailed above, Thomas Miller agreed under the Policy to "pay those sums that the insured becomes legally obligated by Washington Law to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Dkt. No. 59 at 51. The Policy also states that Thomas Miller "will have the right and duty to defend the insured against any 'suit' seeking those damages," but "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." *Id.* The Policy defines "property damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured," *id.* at 65, and "suit" is defined as "a civil proceeding in which damages because of 'bodily injury,' property damage' or 'personal and advertising injury' to which this insurance applies are alleged," *id.* at 66. The policy does not specifically define what it means to have sums awarded "as damages."

The Court begins its analysis by examining the policy's provisions to determine if the complaint's allegations are conceivably covered. *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167, 1172 (Wash. 2000). If the allegations are conceivably covered, the Court must determine whether a policy exclusion clearly and unambiguously applies to bar coverage. *Id.*

1  **1. At Least Some Relief Sought by Plaintiffs in the Underlying Litigation Conceivably Qualifies as Sums that the Defendants Could be Legally Obligated by Washington Law to Pay as Damages Because of Property Damage Within the Meaning of the Policy**

Thomas Miller contends that because the Underlying Litigation is not a suit to recover "damages" for "property damage" suffered by the plaintiffs in the Underlying Litigation, the plaintiffs' claims in the Underlying Litigation do not fall within the initial scope of Policy coverage. Dkt. No. 67 at 12–15; Dkt. No. 73 at 14–17. Defendants counter that "the plaintiffs in the Underlying Litigation plainly allege physical damage to tangible property" and have asked the Court "to issue a judgment that, among other things, will require Electron Hydro to pay money," so the Underlying Litigation "plainly falls within the Policy's initial coverage grant." Dkt. No. 76 at 9; *see also* Dkt. No. 70 at 21 (stating that "the underlying complaints by DOJ and the Puyallup Tribe both expressly allege damage to tangible property").

Both dictionaries and precedent define the word "damages" as "[t]he value, estimated in money, of something lost or withheld; the sum of money claimed or adjudged to be paid in compensation for loss or injury sustained." Damages, Oxford English Dictionary, https://www.oed.com/dictionary/damage_n; *see also* Damages, Merriam-Webster, https://www.merriam-webster.com/dictionary/damages ("compensation in money imposed by law for loss or injury"); *Boeing Co. v. Aetna Casualty & Surety Company*, 784 P.2d 507, 511 (Wash. 1990) (consulting both standard and technical dictionaries to define "damages" in a similar commercial general liability contract as "the estimated reparation in money for detriment or injury sustained" or "[t]he amount required to pay for a loss"). Therefore, to fall within the initial scope of Policy coverage, Defendants must demonstrate that the Underlying Litigation qualifies as a "suit" seeking compensation because of "property damage," i.e., "[p]hysical injury to tangible property, including all resulting loss of use of that property." Dkt. No. 59 at 65.

Both parties rely extensively on the Washington Supreme Court's decision in *Boeing Co. v. Aetna Casualty & Surety Company*, 784 P.2d 507 (Wash. 1990) to support their respective arguments. Dkt. No. 67 at 13, 16–17, 18; Dkt. No. 70 at 21; *see also* Dkt. No. 73 at 15–17; Dkt. No. 76 at 9–11. In that case, policyholders were sued by the United States Environmental Protection Agency ("EPA") in federal district court pursuant to the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq. Boeing*, 784 P.2d at 509. The federal district court entered a consent decree between the EPA and the policyholders, requiring the policyholders to pay environmental response costs. *Id.* The policyholders carried insurance with a provision nearly identical to the one at issue here providing that the insurers would "pay on behalf of the insured all sums which the insured shall become obligated to pay *as damages* because of . . . property damage to which this policy applies[.]" *Id.* at 509–10. The policyholders subsequently sued their insurers for indemnification of their response costs. *Id.* at 510. The Washington Supreme Court held that money paid or to be paid by the policyholders for response costs constituted "damages" within the ordinary meaning of the term as it was used in a comprehensive general liability policy. *Id.* at 510, 516. The court reasoned that even though response costs "may be characterized as seeking 'equitable relief,'" they were still "essentially compensatory damages for injury to property" because such "duty to pay money is no different from the legal obligation that burdens a party who has been held liable to restore property to the condition it was in prior to the occurrence of the tortfeasor's conduct or damages consisting of amounts necessary to restore property to its status quo." *Id.* at 511, 516 (citations omitted). In other words, "coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder." *Id.* at 511 (quoting *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F. Supp. 71, 75 (E.D. Mich. 1987)); *see also Tsakopoulos v. Am. Mfrs. Mut. Ins. Co.*, No.

1  CIV.S990853 GEB JFM, 2003 WL 22595248, at *4 (E.D. Cal. Aug. 9, 2000) (because the

2  California Supreme Court had previously held that injunctions requiring environmental response

3  costs are "damages" given the "purposes addressed" through the imposition of the injunctive relief,

4  it would also likely hold that "the phrase 'damages' in the relevant policies encompasses injunctive

5  restorative relief imposed under the CWA" (quoting *AIU Ins. Co. v. Superior Ct.*, 799 P.2d 1253,

6  1276–78 (Cal. 1990)).

7      Here, as in *Boeing*, the Court concludes that the words "as damages" are not so limiting as

8  Thomas Miller argues. *Boeing*, 784 P.2d at 510–11. Indeed, the portion of the Pollution

9  Endorsement in the Policy which specifically excludes any "loss, cost, or expense . . . incurred by

10  a governmental unit or any other person or organization to test for, monitor, clean-up, remove,

11  contain, treat, detoxify or neutralize pollutants," Dkt. No. 59 at 69, would be rendered largely

12  superfluous if such "loss[es], cost[s], or expense[s]" were not "damages" otherwise covered under

13  the policy. *See Tsakopoulos*, 2003 WL 22595248, at *5. An insurance policy provision should not

14  be construed so that another policy provision is rendered mere surplusage. *Snohomish Cnty. Pub.*

15  *Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 271 P.3d 850, 856 (Wash. 2012) ("An

16  interpretation of a contract that gives effect to all provisions is favored over an interpretation that

17  renders a provision ineffective, and a court should not disregard language that the parties have

18  used.").

19      Furthermore, the Court sees no reason to depart from the Washington Supreme Court's

20  holding in *Boeing* that even though response costs "may be characterized as seeking 'equitable

21  relief,'" they were still "essentially compensatory damages for injury to property" because such

22  "duty to pay money is no different from the legal obligation that burdens a party who has been

23  held liable to restore property to the condition it was in prior to the occurrence of the tortfeasor's

24

conduct or damages consisting of amounts necessary to restore property to its status quo." 784

P.2d at 511, 516.[9] As the Ninth Circuit aptly observed in *Aetna Cas. & Sur. Co. v. Pintlar Corp.*,

> Dictionary definitions indicate that in the lexicon of the ordinary person, the plain meaning of the term "damages" would include response costs. This is so because the term "damages", in common thought, does not distinguish between equitable and nonequitable relief.

948 F.2d 1507, 1513 (9th Cir. 1991) (footnote omitted).

At least some of the relief sought by the United States' complaint in the Underlying

Litigation required Defendants to, "at [their] own expense," "restore and/or mitigate the damages

caused by their unlawful activities," Dkt. No. 69 at 15; Dkt. No. 72-7 at 3; *see also* Dkt. No. 69 at

36; Dkt. No. 72-7 at 18–19. The Puyallup Tribe's complaint alleged that its treaty fishing rights

and reserved water rights "have been irreversibly impacted by [Defendants'] actions and violations

of the Clean Water Act," Dkt. No. 72-3 at 5; Dkt. No. 69 at 42, and sought an order requiring

Defendants to, among other things, "take immediate steps to remediate and mitigate the harm

caused by the discharge of the waste artificial turf and crumb rubber" and "take specific actions to

remediate the environmental harm caused by its violations," Dkt. No. 72-3 at 34–35; Dkt. No. 69

at 73, 75. If awarded to the plaintiffs, such relief would constitute "sums that the insured bec[ame]

legally obligated by Washington Law to pay as damages[.]" Dkt. No. 59 at 51.

The next issue is whether Defendants' liability for such damages was "because of . . .

'property damage[.]'" Dkt. No. 59 at 51. The Policy defines "property damage" to mean

---

[9] *See also id.* at 511 ("Numerous federal and sister-state decisions . . . agree that 'damages' include cleanup costs."); *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 874 P.2d 142, 146 (Wash. 1994) ("[U]nder Washington law 'damages' under a CGL insurance policy include environmental cleanup costs."); *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1563 (9th Cir. 1991) (under California law, "costs incurred to comply with an injunction mandating cleanup or to reimburse a government agency for cleanup expenses the agency has incurred are 'damages' within the meaning of the [CGL] insurance policy."); *United States v. Conservation Chem. Co.*, 653 F. Supp. 152, 193 (W.D. Mo. 1986) ("The great weight of authority equate 'equitable' response or cleanup costs with property damage." (collecting cases)); *U.S. Aviex Co. v. Travelers Ins. Co.*, 336 N.W.2d 838, 843 (Mich. Ct. App. 1983) (finding that remediation costs were "damages" where insured caused contamination of subterranean and percolating water and observing that "[t]he damage to the natural resources is simply measured in the cost to restore the water to its original state").

"[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." *Id.* at 65. Thomas Miller argues that the Underlying Litigation did not involve property damage because (1) the United States lacks any property right or "proprietary interest" in the river; (2) the other plaintiffs in the Underlying Litigation are not suing for any injuries (such as injuries to the Puyallup Tribe's treaty rights) but are instead stepping into the United States' shoes as private attorneys general; and (3) "[m]itigation is intended to compensate for environmental harm through restoration elsewhere in the environment." Dkt. No. 73 at 4–5. The Court again disagrees with Thomas Miller.

First, the Policy language does not include any limitation that the property allegedly damaged must belong to the plaintiff who sues the insured; instead, it more broadly covers "those sums that the insured becomes legally obligated by Washington Law to pay as damages because of . . . 'property damage' *to which this insurance applies*," i.e., "physical injury to tangible property." Dkt. No. 59 at 51, 65. Thus, while Thomas Miller argues that "[t]he phrase 'as damages' requires some form of action that compensates *the plaintiff* for their loss," Dkt. No. 73 at 14 (emphasis added), the Policy language requires only some form of action that compensates for *a* loss.

Second, this Court finds persuasive those decisions that have found that contamination or pollution of waters constitutes "physical injury to tangible property." *See, e.g.*, *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir. 1986) ("[T]he 'reasonable, enlightened view' that the Oregon Supreme Court would adopt would be that discharge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause."); *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1030 (2d Cir. 1991) (holding that "[t]he presence of the pollution in the drainage stream and Ottauquechee River and groundwater clearly represent actual damage to the surface and

groundwater" and constituted property damage within the meaning of the policy at issue); *Douglas Ridge Rifle Club v. St. Paul Fire & Marine Ins. Co.*, No. CV 08-29-AC, 2010 WL 98942, at *6 (D. Or. Jan. 8, 2010) (finding that insurer had a duty to defend against action seeking remediation of contaminated river because such relief "would necessarily constitute property damage in the form of cleanup costs covered by the Policy"); *Hartford Fire Ins. Co. v. Guide Corp.*, No. IP 01-572-C-Y/F, 2005 WL 5899840, at *8 (S.D. Ind. Feb. 14, 2005) ("The White River and the fish and other wildlife that were in it are tangible property and they were physically injured by the pollutant releases."); *Kutsher's Country Club Corp. v. Lincoln Insurance Co.*, 465 N.Y.S.2d 136, 139 (N.Y. Sup. Ct. 1983) (holding that an oil spill into water constituted property damage as defined in an insurance policy providing for liability for damage to property); *Lansco, Inc. v. Dep't of Env't Prot.*, 350 A.2d 520, 524 (N.J. Super. Ch. Div. 1975) (rejecting the argument that "the term 'property damage' must be read as meaning measurable damage to identifiable physical property" in case involving accidental oil spill into a river because "[i]t has long been established that the sovereign's interest in the preservation of public resources and the environment enables it to maintain an action to prevent injury thereto"). In Washington State, "[s]ubject to existing rights[,] all waters within the state belong to the public[.]" Wash. Rev. Code § 90.03.010. Existing rights in the Puyallup River include those of the Puyallup Tribe.[10] "The Government uses its sovereign power in actions under the [CWA] to protect the public interest." *United States v. Telluride Co.*, 146 F.3d 1241, 1245 n.3 (10th Cir. 1998); *see also* 33 U.S.C. § 1251 (stating the objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's

---

[10] The Puyallup Tribe owns the "bed and banks of the Puyallup River within its reservation," and its "rights to fish in these waters are reserved and protected by the Treaty of Medicine Creek." Dkt. No. 72-3 at 4; *see also* Puyallup Tribe of Indians Settlement Act of 1989, Pub. L. No. 101-41, § 3(b)(6), 103 Stat. 83, 85; Treaty of Medicine Creek, 10 Stat. 1132 (1855); *United States v. Washington*, 384 F. Supp. 312, 370–71 (W.D. Wash. 1974); *United States v. Washington*, 626 F. Supp. 1405, 1441–42 (W.D. Wash. 1981). Such tribal water rights "necessarily carry a priority date of time immemorial." *United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1983).

waters"). The CWA also empowers citizens to protect the public interest by enforcing the CWA. 33 U.S.C. § 1365. To do so, a citizen plaintiff must have an Article III injury and "an interest which is or may be adversely affected." *Id.* § 1365(g).

In its complaint in the Underlying Litigation, the United States averred that Defendants' "unlawful activities" caused "damages" to the Puyallup River, which is "home to several species of fish protected by the Endangered Species Act and subject to treaty rights [of] the Puyallup Tribe." Dkt. No. 72-7 at 3; Dkt. No. 69 at 15.[11] As Defendants contend, this alleges physical injury to tangible property within the meaning of the Policy. Dkt. No. 70 at 21; *see Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1514 (9th Cir. 1991) (noting that contamination caused the government to "sustain[] 'property damage' to its quasi-sovereign interest in environmental resources"). The Puyallup Tribe's complaint alleged that its treaty fishing rights and reserved water rights "have been irreversibly impacted by [Defendants'] actions and violations of the Clean Water Act[.]" Dkt. No. 72-3 at 5; Dkt. No. 69 at 42. Treaty rights are property rights, *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968), and this allegation sufficed to demonstrate Article III injury and an interest which was adversely affected by the Defendants' actions. *See Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021). This also alleges physical injury to tangible property within the meaning of the Policy, as Defendants argue. Dkt. No. 70 at 21. Both the United States and the Tribe sought, among other relief, an order requiring Defendants to mitigate and remediate the injury caused by Defendants' actions. Dkt. No. 72-7 at 3, 18–19 (United States' Complaint); Dkt. No. 69 at 15, 36 (United States' Amended

---

[11] Notably, the United States holds the bed and banks of the Puyallup River in trust for the Tribe and is also its trustee with respect to the Tribe's fishing and water rights. *See* Puyallup Tribe Settlement Agreement, § I.B (Aug. 27, 1988), *available at* https://www.puyalluptribe-nsn.gov/wp-content/uploads/Land-Claims-Settlement-Agreement.pdf; *United States v. Washington*, 853 F.3d 946, 958 (9th Cir. 2017) (noting that the United States enforces treaty fishing rights on its own behalf and as trustee on behalf of tribes); *Winters v. United States*, 207 U.S. 564, 574 (1908) (United States enforcing tribal water rights).

Complaint requesting same); Dkt. No. 72-3 at 34–35 (Puyallup Tribe's Complaint); Dkt. No. 69 at 73, 75 (Puyallup Tribe's Amended Complaint). Absent the physical injury to the Puyallup River described above, there would be nothing to remediate or mitigate. Thus, Defendants' liability for such damages was "because of" physical injury to tangible property within the meaning of the Policy. Dkt. No. 59 at 51.

2. <u>The Pollution Endorsement Conceivably Covers Some of the Relief Sought by Plaintiffs in the Underlying Litigation</u>

The next issue is whether the plaintiffs' claims in the Underlying Litigation are excluded by the Policy's Pollution Endorsement. As discussed above, there are three components to this Endorsement. First, the Policy does not cover as a general matter "[b]odily injury or propery damage arising out of the actual or threatened discharge, dispersal, seepage, release or escape of pollutants[.]" Dkt. No. 59 at 69. Second, under the buyback, the Policy will nevertheless apply if such "discharge, dispersal, seepage, migration, release or escape of pollutants" meets five conditions: (1) "[i]t was accidental and neither expected nor intended by the insured"; (2) "[i]t was demonstrable as having commenced on a specific date during the term of th[e] Policy"; (3) [i]ts commencement became known to the named insured within 20 calendar days; (4) "[i]ts commencement was reported in writing to [the underwriters] within 80 days of becoming known to the finance department"; and (5) "[r]easonable effort was expended by the named insured to terminate the situation as soon as conditions permitted." *Id.* And third, notwithstanding the above, the Policy will not provide coverage with respect to, as relevant here, "[a]ny site or location principally used by the insured . . . for the handling, storage, disposal, dumping, processing or treatment of waste material," "[a]ny fines or penalties," and "[a]ny clean up costs ordered by . . . any federal, state or local governmental authority." *Id.*

1    There is no dispute of material fact that the first two components of the Pollution

2    Endorsement apply here. *See* Dkt. No. 67 at 19–22 (Thomas Miller's motion for summary

3    judgment advancing arguments under the Pollution Endorsement's exclusions to the buyback,

4    which assumes the applicability of the buyback); Dkt. No. 72-4 at 21–25; Dkt. No. 70 at 22–23.[12]

5    Turning to the third component of the Pollution Endorsement, Thomas Miller contends that the

6    relief sought by plaintiffs in the Underlying Litigation—i.e., remediation of environmental harm

7    and fines and penalties under the CWA—is expressly excluded by the Pollution Endorsement as

8    "clean up costs ordered by . . . any federal, state, or local governmental authority" or as "fines or

9    penalties." Dkt. No. 67 at 20–22.[13][14] Defendants concede that "any fines, civil penalties, or clean-

---

[12] For the first time in its opposition to Defendants' motion for summary judgment, Thomas Miller argues that Defendants' "placement of a pollutant in a water of the United States" is excluded under the Policy because (1) "intentional placement of waste field turf is 'expected or intended'"; (2) "it was property Electron Hydro owned, rented, or occupied by its contractors or subcontractors"; and (3) "it was arising out of or related to Electron Hydro's work." Dkt. No. 73 at 23–24. Thomas Miller cites no record evidence to support these arguments. *See id.* at 23–25. Indeed, the record—along with the plain language of the Policy and Thomas Miller's own arguments—directly undermine these assertions. First, Thomas Miller's assigned claims handler testified at deposition that Thomas Miller "ha[d] no information" indicating that the alleged discharges giving rise to the Underlying Litigation were not accidental or were expected or intended by Defendants. Dkt. No. 72-4 at 21; *see also id.* at 25. Thomas Miller points to no record evidence contradicting its claims handler's opinion.

Second, the Policy excludes "property damage" to "property [the insured] own[s], rent[s], or occup[ies]." Dkt. No. 59 at 54. Nowhere in the record—or elsewhere in Thomas Miller's briefing—does it indicate that the damage in this case was to Defendants' property. Instead, as Thomas Miller emphasizes, the alleged injury in this case is to the Puyallup River and its bed and banks—not to any property owned by Defendants. Dkt. No. 73 at 3–4.

Third, Thomas Miller raised none of these potential bases for denial of coverage until the eleventh hour of litigation. As Defendants point out, Thomas Miller "cannot now raise new exclusions[.]" Dkt. No. 76 at 7 n.2. Not only were these exclusions entirely absent from Thomas Miller's coverage determinations, *see, e.g.*, Dkt. Nos. 72-13, 72-14, its assigned claims handler made no mention of these exclusions when asked various questions regarding Thomas Miller's coverage position and determinations, *see generally* Dkt. No. 72-4. It would be highly prejudicial to Defendants to permit Thomas Miller to advance new bases for denial of coverage for the first time in summary judgment opposition briefing after Defendants were not alerted to these bases during discovery and where there is no reason that Thomas Miller could not have raised these bases at the time it issued its reservation of rights letter. *See Karpenski v. Am. Gen. Life Companies, LLC*, 999 F. Supp. 2d 1235, 1245 (W.D. Wash. 2014) (Washington's "mend the hold" doctrine "precludes an insurer from changing the basis for avoiding liability after the onset of litigation"); *Hayden*, 1 P.3d at 1170 (doctrine applies when the insured "suffered prejudice or the insurer acted in bad faith when the insurer failed to raise all its grounds for denial in its initial denial letter"); *Bosko v. Pitts & Still Inc.*, 454 P.2d 229, 234 (Wash. 1969) (Where "an insurer denies liability under the policy for one reason, while having knowledge of other grounds for denying liability, it is estopped from later raising the other grounds in an attempt to escape liability, provided that the insured was prejudiced by the insurer's failure to initially raise the other grounds.").

[13] Thomas Miller does not argue that any other exclusion in this five-part list (Dkt. No. 1 at 69–70) applies and has therefore waived the argument. Dkt. No. 67 at 19–22; *see generally* Dkt. No. 73.

[14] Thomas Miller also contends in conclusory fashion that the Underlying Litigation alleges that Defendants "handled,

up costs imposed in the Underlying Litigation fall within the scope" of the Pollution Endorsement's buyback exclusions, Dkt. No. 70 at 23, but argue that any award of compensatory mitigation damages—such as restoration of degraded habitat or conservation of critical habitat—would not constitute "fines," "penalties," or "cleanup costs." Dkt. No. 70 at 9, 12, 23; *see also* Dkt. No. 76 at 11.

Again, in evaluating whether the insurer owes a duty to defend, the Court must liberally construe the underlying complaints to determine whether the policy could conceivably cover the claims. *Expedia, Inc. v. Steadfast Ins. Co.*, 329 P.3d 59, 64 (Wash. 2014); *Am. Best Food*, 229 P.3d at 696. As Thomas Miller acknowledges, the United States and the Puyallup Tribe both sought mitigation in their complaints. Dkt. No. 72-7 at 19 (United States' Complaint requesting that the Court order Electron Hydro "to mitigate the effects of each of its violations"); Dkt. No. 69 at 36 (United States' Amended Complaint requesting same); Dkt. No. 72-3 at 34 (Puyallup Tribe's Complaint requesting that the Court order Defendants to "mitigate the harm caused by the discharge of the waste artificial turf and crumb rubber"); Dkt. No. 69 at 73 (Puyallup Tribe's Amended Complaint requesting same). Defendants have established that such mitigation could be compensatory such that it constitutes "sums that the insured becomes legally obligated by Washington Law to pay as damages because of . . . 'property damage.'" Dkt. No. 59 at 51.

---

stored, and disposed of waste crumb rubber, yarn, and plastic as the foundation for [the Underlying Litigation plaintiffs'] claim," and therefore "there is no coverage under the Policy." Dkt. No. 67 at 22. However, as Defendants point out, this exclusion requires that the subject site or location be "*principally used* by the insured . . . for the handling, storage, disposal, dumping, processing or treatment of waste material" to bar coverage. Dkt. No. 59 at 69 (emphasis added). Defendants aver that "the principal purpose of Electron Hydro's [F]acility is producing hydropower," not handling waste material, as reflected in the Policy language. Dkt. No. 70 at 24; *see also* Dkt. No. 59 at 42–43 (describing the Electron Hydroelectric Project and noting that "[t]he owners [of Electron Hydro] are engineers that specialize in design/build of hydro diversion dams for electric utilities" who purchased the facility "from the utility they built [it] for."). Thomas Miller does not present any evidence to rebut this argument; indeed, Thomas Miller's assigned claims handler testified that he would not have any reason to disagree with the proposition. Dkt. No. 72-4 at 4 ("I wouldn't have any reason to disagree. . . . And just based on the title of the company, I would – I believe that to be the case."). The Court finds that the Pollution Endorsement does not bar coverage for the claims in the Underlying Litigation on this basis.

Specifically, Defendants point to (1) federal regulations governing compensatory mitigation to offset adverse impacts to aquatic resources, and (2) the disclosure of the United States' expert witness in the Underlying Litigation. Dkt. No. 70 at 9. The federal regulations explain that "compensatory mitigation is a critical tool in helping the federal government to meet the longstanding national goal of 'no net loss' of wetland acreage and function." 73 Fed. Reg. 19594-01, 19594. Compensatory mitigation "can be carried out through four methods: the restoration of a previously-existing wetland or other aquatic site, the enhancement of an existing aquatic site's functions, the establishment (i.e., creation) of a new aquatic site, or the preservation of an existing aquatic site." *Id.* Consistent with these regulations, the expert witness's disclosure states that she expected to present evidence in the Underlying Litigation on "[t]he remedies appropriate under the federal Clean Water Act . . . to provide restoration and mitigation to the [affected] resources and processes"; and that she had determined "[t]hat appropriate and commensurate compensatory mitigation is required to provide for temporal and habitat replacement of direct and indirect impacts to aquatic resources affected by the construction activities at the Electron Hydro Facility." Dkt. No. 72-9 at 2–3 (noting that compensatory mitigation "may include restoration of degraded or impaired aquatic and riparian habitat, and/or the conservation of critical habitat needed for the spawning, rearing and foraging of federal listed fish species").

Based on the potential forms the mitigation requested in the plaintiffs' complaints could take, the ultimate relief could be compensatory yet fall outside the scope of excluded "clean up costs." This conclusion is supported by the plain language of the Policy. Specifically, the Pollution Endorsement excludes from the buyback "[a]ny clean up costs ordered by . . . any federal, state or local governmental authority," and in a separate exclusion it uses other terms alongside "clean up" to describe potential damages incurred by the insured for pollution, including losses, costs, or expenses associated with "test[ing] for, monitor[ing], remov[ing], contain[ing], treat[ing],

detoxify[ing] or neutraliz[ing] pollutants." Dkt. No. 59 at 69–70. The use of these different terms in the Policy language indicates that "clean up costs" has a narrower breadth than Thomas Miller argues; at a minimum, it does not encompass losses, costs, or expenses associated with testing for, monitoring, removing, containing, treating, detoxifying or neutralizing pollutants, and it also may not encompass compensatory mitigation. As the Court found above, losses, costs, or expenses that are "essentially compensatory damages for injury to property," constitute "sums that the insured bec[ame] legally obligated by Washington Law to pay as damages[.]" *Id.* at 51. Thus, any mitigation damages that are compensatory in nature and are not "clean up costs," fines, or penalties would conceivably be covered by the Policy. The burden accordingly shifts to Thomas Miller to "show[] the loss is excluded by specific policy language." *Overton*, 38 P.3d at 329.

Thomas Miller does not do so. Instead, it concedes that plaintiffs in the Underlying Lawsuit sought mitigation in their initial complaints, Dkt. No. 73 at 5, and that whether such relief constitutes compensatory mitigation such that it may be covered by the Policy involves "factual issues" that "cannot be resolved on summary judgment," *id.* at 13. These concessions demonstrate that the requests for relief in the Underlying Lawsuit could conceivably be covered under the Pollution Endorsement, and that the exceptions to the buyback in the Pollution Endorsement do not clearly and unambiguously apply to completely bar coverage. *See* Dkt. No. 76 at 11 n.4. Where, as here, "coverage is not clear from the face of the complaint but coverage could exist, the insurer must investigate and give the insured the benefit of the doubt on the duty to defend." *Expedia, Inc.*, 329 P.3d at 65.

### 3. Allocation Between Covered and Uncovered Claims

Finally, Defendants argue that "because DOJ's damages theories all rest on the same liability and causation arguments, there is no reasonable basis for [Thomas Miller] to apportion [Defendants'] defense costs between covered and covered claims." Dkt. No. 70 at 25. As Thomas

Miller points out, it has not sought this relief. Dkt. No. 73 at 25. Therefore, the Court finds that defense costs shall not be allocated.

* * *

For the above reasons, the Court grants Defendants' motion for summary judgment that Thomas Miller had a duty to defend them in the Underlying Litigation.

## D.  Duty to Indemnify

Because "the duty to indemnify arises when an insured is actually liable to a claimant and that claimant's injury is covered by the language of the policy," *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 873 n.7 (Wash. 2008), Thomas Miller's duty to indemnify did not arise until the Court entered the consent decree in the Underlying Litigation on July 11, 2024. *United States v. Electron Hydro, LLC*, No. 2:20-cv-01746-JCC, Dkt. No. 175; *see also Weyerhaeuser Co. v. Ins. Co. of State of Pennsylvania*, No. C08-1037Z, 2009 WL 2461163, at *4 (W.D. Wash. Aug. 10, 2009) (finding that insurer's duty to indemnify did not arise until the underlying litigation was settled); *see also Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1564–65 (9th Cir. 1991) (consent decree costs can be "damages"); *Emps. Ins. of Wausau v. California Water Serv. Co.*, No. C-06-03002 RMW, 2008 WL 3916096, at *15 (N.D. Cal. Aug. 25, 2008) (same); *Maryland Cas. Co. v. Wausau Chem. Corp.*, 809 F. Supp. 680, 692 (W.D. Wis. 1992) (same). Due to the timing of their briefing in this matter, the parties have not yet had an opportunity to address the applicability of the Policy language to the relief awarded in the consent decree. Therefore, before the Court can determine whether Thomas Miller has a duty to indemnify Defendants, it requires further input from the parties. The parties appear to agree on this outcome: as noted above, Thomas Miller argues that whether the relief in the consent decree constitutes compensatory mitigation such that it may be covered by the Policy involves factual issues that cannot be resolved at this stage, Dkt. No. 73 at 13, while Defendants "agree[] that further briefing will be necessary

1    to determine the scope of [Thomas Miller]'s obligations in relation to the Consent Decree i[f] and

2    when it is ultimately entered[.]" Dkt. No. 76 at 13 n.6.

3    **E.    Coverage by Estoppel**

4            Defendants contend in their cross-motion that they are entitled to coverage under the Policy

5    because Thomas Miller acted in bad faith as a matter of law by breaching numerous duties required

6    of insurers under Washington law and functionally denying their claim. Dkt. No. 70 at 14–17.

7            Under Washington law, "[i]f an insured prevails on a bad faith claim, the insurer is

8    estopped from denying coverage . . . even where coverage never in fact existed." *Aecon Bldgs.,*

9    *Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1234 (W.D. Wash. 2008) (internal citations omitted).

10   "Claims of insurer bad faith are analyzed applying the same principles as any other tort: duty,

11   breach of that duty, and damages proximately caused by any breach of duty." *St. Paul Fire &*

12   *Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008) (cleaned up). "[T]o succeed on a

13   bad faith claim, the policyholder must show the insurer's breach of the insurance contract was

14   unreasonable, frivolous, or unfounded." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash.

15   2003). Washington courts have repeatedly emphasized that the test for bad faith "is not whether

16   the insurer's interpretation [of the policy] is correct, but whether the insurer's conduct was

17   reasonable." *Wright v. Safeco Ins. Co.*, 109 P.3d 1, 10 (Wash. Ct. App. 2004); *see also Anderson*

18   *v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000) ("The determinative

19   question is reasonableness of the insurer's actions in light of all the facts and circumstances of the

20   case."). Thus, coverage by estoppel does not apply if an insurer commits only a "procedural

21   misstep"; rather, an insurer must breach its duty of good faith in order for the insured to be entitled

22   to coverage. *St. Paul & Marine Ins. Co.*, 196 P.3d at 669.

23           Whether the insurer acted reasonably is often a question of fact. *Smith*, 78 P.3d at 1277;

24   *Hell Yeah Cycles v. Ohio Sec. Ins. Co.*, 16 F. Supp. 3d 1224, 1235 (E.D. Wash. 2014) ("Bad faith

claims generally raise fact issues preventing a determination on summary judgment."). But this is not a free ticket to trial, as the insured "has the burden of proof" and "must come forward with evidence that the insurer acted unreasonably." *Smith*, 78 P.3d at 1277; *Overton*, 38 P.3d at 329 ("Claims of bad faith are not easy to establish and an insured has a heavy burden to meet."). The Court will therefore grant summary judgment "only if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances, or the insurance company is entitled to prevail as a matter of law on the facts construed most favorably to the nonmoving party." *Smith*, 78 P.3d at 1277. The insurer's ability to point to a reasonable basis for its action is "significant evidence that it did not act in bad faith and may even establish that reasonable minds could not differ that its denial of coverage was justified." *Id.* at 1278.

Defendants argue that Thomas Miller handled their claims in bad faith by (1) failing to acknowledge Defendants' claim within 10 days of notification in violation of Section 284-30-360 of the Washington Administrative Code, Dkt. No. 70 at 14–16; (2) failing to defend Defendants, adopt and implement reasonable standards for the prompt investigation of Defendants' claims, investigate the claim within 30 days, and provide written updates in accordance with Washington regulations, *id.* (citing Wash. Admin. Code §§ 284-30-330(4), -370, -380(3)); and (3) failing to provide Defendants a written coverage determination for nearly 18 months, including the basis for a reservation of rights, *id.* (citing Wash. Admin. Code § 284-30-330(13)). The Court examines each of these in turn.

1. Washington Administrative Code Section 284-30-360

Defendants aver that Thomas Miller "did not acknowledge Electron Hydro's claim in writing to Electron Hydro within 10 days" in violation of Section 284-30-360(1) of the Washington Administrative Code. Dkt. No. 70 at 15–16 (emphasis omitted). This assertion is without merit.

Section 284-30-360(1) provides that "[w]ithin ten working days after receiving notification of a claim under an individual insurance policy . . . the insurer must acknowledge its receipt of the notice of claim." Defendants do not clearly state—nor can the Court discern—how Thomas Miller violated this regulation. Thomas Miller first received notice from Howden of a "contamination" event in the Puyallup River on October 8, 2020. Dkt. No. 72-5 at 2–3; Dkt. No. 74 at 2, 12. It provided a written response to Howden two business days later on October 12, 2020, acknowledging receipt of the claim and recommending that Electron Hydro retain counsel. *Id.* at 2; *see also id.* at 10–11. And on October 19, 2021, Howden sent Thomas Miller a message requesting reimbursement for legal defense invoices amounting to $318,434.52 (after deduction of non-reimbursable expenses and a $100,000 deductible), *id.* at 5, 78; Thomas confirmed receipt of the invoices four business days later on October 25, 2021, *id.* at 5–6, 77.

Defendants appear to claim that Thomas Miller was required to acknowledge Defendants' claim in writing to Defendants directly—as opposed to Defendants via Howden. Dkt. No. 70 at 7 ("[Thomas Miller] did not send any correspondence directly to Electron Hydro acknowledging its claim for coverage[.]"), 10 ("[Thomas Miller] did not acknowledge Electron Hydro's claim in writing to Electron Hydro within 10 days." (emphasis removed)); *see also id.* at 7, 9; Dkt. No. 76 at 3, 5. But Section 284-30-360(1) imposes no such requirement; in fact, it provides that "[i]f an acknowledgment is made by means other than writing, an appropriate notation of the acknowledgment must be made in the claim file of the insurer describing how, when, and to whom the notice was made." Wash. Admin. Code § 284-30-360(1)(b). Defendants do not claim that this procedure was not followed. And Defendants point to no authority that states that the acknowledgment must be to the insured directly and not to a broker. Therefore, Defendants' allegations that Thomas Miller breached its duties under Section 284-30-360 are meritless.

1    2.  Duty to Defend and Failure to Investigate

2    Defendants next contend that Thomas Miller "failed to conduct any reasonable

3 investigation into Electron Hydro's claim or request any additional documentation other than the

4 initial notices of claim Electron Hydro tendered through its broker" in violation of Sections 284-

5 30-330(4) and 284-30-370 of the Washington Administrative Code. Dkt. No. 70 at 15; Wash.

6 Admin. Code §§ 284-30-330(4) (defining as an unfair claims settlement practice the "[r]efus[al]

7 to pay claims without conducting a reasonable investigation"), 284-30-370 (requiring that "[e]very

8 insurer must complete its investigation of a claim within thirty days after notification of claim,

9 unless the investigation cannot reasonably be completed within that time"). Defendants appear to

10 contend that these failures amounted to a violation of Thomas Miller's duty to defend in good faith

11 as an insurer under Washington law. *See* Dkt. No. 70 at 16.

12    When the duty to defend attaches, an insurer "may not desert policyholders and allow them

13 to incur substantial legal costs while waiting for an indemnity determination." *Expedia, Inc.*, 329

14 P.3d at 64 (quoting *Truck Ins. Exch. v. Vanport Homes, Inc.*, 58 P.3d 276, 282 (Wash. 2002)). The

15 insurer then must defend the insured "until it is clear that a claim is not covered under the policy."

16 *Id.* (citing *Am. Best Food*, 229 P.3d at 696). "The entitlement to a defense may prove to be of

17 greater benefit to the insured than indemnity." *Am. Best Food*, 229 P.3d at 696 (citing *Truck. Ins.*

18 *Exch.*, 58 P.3d at 284). Again, "if coverage is not clear from the face of the complaint but coverage

19 could exist, the insurer must investigate and give the insured the benefit of the doubt on the duty

20 to defend." *Expedia, Inc.*, 329 P.3d at 65. Such investigation must be "reasonable and prompt,"

21 but insurers "need not necessarily investigate every discrete element." *Bridgham-Morrison v. Nat'l*

22 *Gen. Assurance Co.*, No. C15-927-RAJ, 2016 WL 2739452, at *6 (W.D. Wash. May 11, 2016)

23 (citation omitted), *aff'd*, 739 F. App'x 381 (9th Cir. 2018). And although "[i]t is an insurer's

24 affirmative duty to investigate a claim before it denies coverage, not the insured's duty to continue

1    supplementing the record to an uninquisitive insurer," *Aecon Bldgs.*, 572 F. Supp. 2d at 1236

2    (internal citation omitted), an insurer should not be held responsible for delays in investigation that

3    are attributable to the insured, *see Am. Mfrs. Mut. Ins. Co. v. Osborn*, 17 P.3d 1229, 1233 (Wash.

4    Ct. App. 2001) (upholding summary judgment in favor of insurer on bad faith claim where trial

5    court "noted that [the policyholder] failed to produce any evidence showing that the delays, which

6    she claimed harmed her, were the result of [the insurer's] actions rather than her own or to produce

7    other evidence supporting a cause of action for unreasonable investigation and claim adjustment").

8        Without weighing the evidence or making any credibility determinations, *Anderson*, 477

9    U.S. at 255, the Court finds that Defendants have not demonstrated that Thomas Miller acted in

10   bad faith. Upon receiving notices of investigation from Puget Sound Energy, the Washington

11   Attorney General's Office, and the Puyallup Tribe in September and October 2020, Defendants

12   provided Thomas Miller with a notice of loss via its local broker HUB International and its U.K.

13   broker Howden Group on October 8, 2020. Dkt. No. 72-4 at 13, 23; Dkt. No. 72-5 at 2–3; Dkt.

14   No. 74 at 12. Thomas Miller first internally acknowledged the claim, noted that it involved the

15   "installation of some artificial turf [that] ha[d] caused pollution to the river," and notified the

16   insurance carrier of a "pending large loss." Dkt. No. 72-5 at 2; *see also* Dkt. No. 72-4 at 5–7; Dkt.

17   No. 72-6 at 2. Thomas Miller then provided a written response to Howden two business days later

18   on October 12, 2020, acknowledging receipt of the claim; recommended that Electron Hydro retain

19   Schwabe as counsel; and began inquiring "what the assured has done to rectify the matter,"

20   whether "there [has] been a liability/pollution response plan in place," and "why there has been a

21   delay in informing the relevant parties of this matter." Dkt. No. 74 at 2, 10–11.

22       Despite this prompt initial response, Defendants contend that Thomas Miller "appears to

23   have done virtually nothing in response to Electron Hydro's claim for the next 17-plus months"

24   and "did not request any information or conduct any additional investigation about the underlying

1   loss or the underlying claims." Dkt. No. 70 at 7–8 (emphasis omitted). Thomas Miller characterizes

2   these arguments as "revisionist history," and recounts how it "sent Defendants at least *seven*

3   written requests for further information and documentation about the claims, each of which

4   Defendants ignored" and how "Defendants' counsel provided no substantive information about

5   the claims beyond two curated procedural updates with no underlying documentation." Dkt. No.

6   73 at 18. This is at least partially corroborated by the evidence. *See* Dkt. No. 74 at 28 (requesting

7   "relevant permits/licenses for the installation of the turf and the work performed" on November 2,

8   2020), 37 (following up with same request on November 16, 2020), 48 (requesting information on

9   agency agreements for use of artificial turf and reserve values); *see also id.* at 5 (discussing Thomas

10  Miller's "multiple requests for information and status updates on the claims").

11      Defendants criticize Thomas Miller's proffered evidence as "a transparent attempt to invert

12  the parties' respective duties under Washington law in order to manufacture a *post hoc* justification

13  for [Thomas Miller's] conduct." Dkt. No. 76 at 5 (emphasis omitted). But Defendants do not

14  contest that the delays in Thomas Miller's investigation were at least in part due to their own delay

15  and lack of prompt communication. *See, e.g.*, Dkt. No. 74 at 37 (failing to provide documents

16  requested by Thomas Miller for at least two weeks after initial request), 49 (stating on November

17  16, 2020 that Electron Hydro staff "has been meeting with resource agency staff on-site" and

18  "[would] be following up with information requests as they come in"); *see also id.* at 5 (discussing

19  alleged failure of Electron Hydro's counsel to provide updates to Thomas Miller until July 9, 2021

20  despite "multiple requests for information and status updates on the claims"). Such a delay does

21  not establish a functional denial of Defendants' claim, as they aver, especially given that Thomas

22  Miller ultimately paid its share of the invoices. Dkt. No. 70 at 14–17; *cf. Bridgham-Morrison v.*

23  *Nat'l Gen. Assurance Co.*, No. C15-927-RAJ, 2016 WL 2739452, at *4 (W.D. Wash. May 11,

24  2016) (a delay does not amount to a denial of payment under IFCA when the dispute is over the

amount owed, "particularly . . . where [the insurer] cannot assess the entirety of [the insured's] claimed damages without additional information"); *Country Preferred Ins. Co. v. Hurless*, No. C11-1349-RSM, 2012 WL 2367073, at *4 (W.D. Wash. June 21, 2012) (finding that a delay caused by a dispute between the parties over amount of wage loss suffered by insured did not establish a "denial of payment").

Additionally, while Defendants contend that Thomas Miller "falsely claim[ed] that Electron Hydro 'ignored' its requests for information," Dkt. No. 76 at 5, they provide no evidence to rebut this claim or Thomas Miller's supporting evidence, Dkt. No. 73 at 10–11. They also do not challenge Thomas Miller's characterization of Nossaman's "status updates" as "two curated procedural updates with no underlying documentation." *Id.* And despite describing Thomas Miller as an "uncommunicative insurer," *id.*, they do not address Thomas Miller's assertions and corroborating evidence that Defendants themselves were the uncommunicative parties, Dkt. No. 73 at 10–11, 20–21.

With the benefit of hindsight, the Court finds that Thomas Miller could certainly have conducted its handling of Defendants' claim more diligently or promptly, including by inquiring more consistently for updates from Nossaman or by issuing its reservation of rights letter sooner. However, this does not mean that Thomas Miller's investigation was unreasonable as a matter of law. *Amini v. Crestbook Ins. Co.*, No. C21-1377-KKE, 2023 WL 6389341, at *9 (W.D. Wash. Oct. 2, 2023). Defendants appear to claim that Thomas Miller erroneously "based its coverage position solely on the complaints in the Underlying Litigation" and did not conduct any additional investigation, Dkt. No. 70 at 11; *see also* Dkt. No. 72-4 at 26–27, but they do not explain what additional investigation was supposedly needed. The dispute between the parties was not about underlying facts, but rather Policy interpretation.

1    Furthermore, Thomas Miller is hardly the "uninquisitive insurer" that relied upon the

2    insured to provide constant updates on the litigation without Thomas Miller's active participation.

3    *Aecon Bldgs.*, 572 F. Supp. 2d at 1236. The record shows that it consistently sought litigation

4    updates from Defendants' counsel so it could evaluate the extent of Policy coverage and counsel's

5    invoices. *See, e.g.*, Dkt. No. 74 at 5–6, 77, 81. The substance of these inquiries from November

6    2020 to July 2021, as well as the quality of the updates provided to Thomas Miller by Defendants'

7    counsel, are, at minimum, outstanding factual questions bearing upon the overall reasonableness

8    of Thomas Miller's investigation.

9    For these reasons, "issues of fact remain as to whether any additional investigation was

10   reasonably necessary or warranted" and whether the investigation could have been completed

11   within 30 days. *Gamble v. State Farm Mut. Auto. Ins. Co.*, No. 3:19-CV-05956-RJB, 2020 WL

12   5081706, at *4 (W.D. Wash. Aug. 27, 2020); *Allstate Indem. Co. v. Lindquist*, No. C20-1508-JLR,

13   2022 WL 1607925, at *13 (W.D. Wash. May 20, 2022).[15] Because a reasonable juror could weigh

14   the evidence and decide that Thomas Miller's investigation was reasonable, or that the

15   investigation could not have been reasonably completed in 30 days, summary judgment on this

16   issue is not appropriate at this time. *Gamble*, 2020 WL 5081706, at *4.[16]

17

18

19   [15] Thomas Miller does not address Defendants' allegation that Thomas Miller violated Section 284-30-370 of the

20   Washington Administrative Code by failing to complete its investigation in 30 days. *See* Dkt. No. 70 at 15; *see generally* Dkt. No. 73. However, that regulation provides that such an investigation need only be completed within 30 days if it can "reasonably be completed within that time." Wash. Admin. Code § 284-30-370. It also requires the

21   insured to "provide reasonable assistance to the insurer in order to facilitate compliance with this provision." *Id.* As established above, there is an issue of material fact as to whether Defendants provided the necessary assistance to Thomas Miller to facilitate compliance with this regulation. The Court therefore cannot award summary judgment to

22   Defendants on this issue. *See Amini*, 2023 WL 6389341, at *10.

23   [16] Defendants also contend that Thomas Miller "did not provide any written explanation as to why it was unable to complete its investigation," or any continuous updates, in violation of Section 284-30-380(3) of the Washington

24   Administrative Code. Dkt. No. 70 at 15–16. They do not, however, provide evidence supporting this alleged violation, and Thomas Miller does not address it. Summary judgment on this issue is therefore also precluded.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 38

3.  <u>Delay in Coverage Determination</u>

Lastly, Defendants claim that Thomas Miller failed to provide Defendants a written coverage determination for nearly 18 months, including the basis for any reservation of rights, in violation of Section 284-30-330(13) of the Washington Administrative Code. Dkt. No. 70 at 15–16; Wash. Admin. Code § 284-30-330(13) (defining as an unfair claims settlement practice the "[f]ail[ure] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement").

Defendants rely on this Court's decision in *Rushforth Construction Co. v. Wesco Insurance Co.*, in which the Court found that an insurer had engaged in bad faith through unreasonable delay when it received the insured's tender in July 2016 and then opened a claim, set reserves, gathered information, and prepared a reservation of rights in the first two months, but subsequently effectively "failed to act on the claim for ten months." No. C17-1063-JCC, 2018 WL 1610222, at *5 (W.D. Wash. Apr. 3, 2018). The Court noted that the insured sent the insurer "four letters inquiring about the status of the claim," and while "an adjuster sent internal email inquiries about the status of the claim," the insurer "took no further action" until after the insurer filed a lawsuit. *Id.*

However, *Rushforth* is easily distinguishable from this case. Specifically, the insurer in *Rushforth* "provid[ed] no specific facts to supply a reasonable basis for its delay that would allow it to survive summary judgment." *Id.* (citing *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277–78 (Wash. 2003)). That is not the case here. Defendants again disregard their own contributions to the delay in coverage determination. As discussed above, Thomas Miller sent Defendants multiple requests for further information regarding both the initial incident and the ongoing Underlying Litigation, but received no or untimely responses to those requests. *See* Dkt. No. 73 at 18; Dkt.

No. 74 at 5, 28, 37, 48. Defendants provide no evidence indicating that these assertions are inaccurate. Defendants also do not address the delay in selecting defense counsel—a four-month delay for which they share the blame. Dkt. No. 74 at 4–5, 61–62. And, unlike the plaintiffs in *Rushforth*, Defendants provide no evidence supporting their allegation that inquiries about the status of their claim went unanswered.

Defendants therefore fail to meet their burden to establish that Thomas Miller handled their claim in bad faith. The Court accordingly denies their motion for summary judgment that they are owed coverage by estoppel.

## F.    Efficient Proximate Cause Rule

In a final attempt to avoid the limits of the Pollution Endorsement, Defendants argue that coverage is warranted under Washington's "efficient proximate cause rule." Dkt. No. 70 at 18–20. This rule provides for coverage "where a covered peril sets in motion a causal chain the last link of which is an uncovered peril." *Xia v. ProBuilders Specialty Ins. Co.*, 400 P.3d 1234, 1240 (Wash. 2017) (cleaned up). "If the initial event, the efficient proximate cause, is a covered peril, then there is coverage under the policy regardless whether subsequent events within the chain, which may be causes-in-fact of the loss, are excluded by the policy." *Id.* (internal quotation marks and citation omitted). The rule "applies only when two or more perils combine in sequence to cause a loss and a covered peril is the predominant or efficient cause of the loss." *Id.* at 1241–42 (cleaned up).

Defendants contend that "every source of available information makes clear that the tear in the HDPE liner was a separate and distinct event from the subsequent release of crumb rubber and artificial turf into the Puyallup River." Dkt. No. 70 at 19. And because "the tear in the HDPE liner, standing alone, is a covered peril for which [Thomas Miller] would be obligated to provide coverage in the absence of related allegations of pollution," and the tear "set into motion the causal chain leading to the alleged pollution at issue," they are entitled to coverage. *Id.* at 20.

Thomas Miller challenges Defendants' framing of the causal chain. In its view, it was not the tear in the HDPE liner that set into the motion the sequence of events that ultimately led to the release of pollutants, but rather Electron Hydro's "intentional placement" of pollutants into the Puyallup River, which is addressed by the Pollution Endorsement. Dkt. No. 73 at 23. And because the intentional placement of pollutants in the water is not covered by the Policy, Thomas Miller argues that the efficient proximate cause rule does not provide coverage for Defendants.

Thomas Miller analogizes the causal chain in this case to that in *Dolsen Companies v. Bedivere Insurance Company*, 264 F. Supp. 3d 1083 (E.D. Wash. 2017). In that case, the policyholders operated concentrated animal farm operations ("CAFOs") and stored millions of gallons of liquid manure in holding ponds. *Id.* at 1086. After the ponds leaked, two environmental groups sued the CAFO policyholders under state and federal environmental laws, alleging that the policyholders "over-applied manure" and caused "significant environmental contamination of the soil and groundwater." *Id.* at 1086–87. The policyholders submitted a tender for defense and indemnity to its insurers, but the insurer denied coverage, citing a pollution exclusion in their policies similar to the one at issue in this case. *Id.* at 1087. The Court concluded that there was no coverage under the policy because "[i]t was the inadequate storage of the manure that caused the seepage—and the negligent construction is necessarily intertwined with the storage." *Id.* at 1094. It noted that the focal point of the analysis "is the relation between the initial act and the pollutant causing harm—viz., whether the initial peril was the polluting act (i.e., whether the incident involved pollutants in the first place) or whether the initial peril was some other act that incidentally led to a polluting harm." *Id.* at 1093.

Importantly, "[t]he efficient proximate cause rule applies only where two or more *independent* forces operate to cause the loss"; when the evidence shows that "the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient

proximate cause analysis has no application," and an insured may therefore "not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." *Kish v. Ins. Co. of N. Am.*, 883 P.2d 308, 311 (Wash. 1994) (emphasis added) (cleaned up). Here, the record shows that within roughly a one-week period, Electron Hydro (1) "constructed a bypass channel to divert water away from the work area adjacent to the facility, which was lined with [HDPE] liner," and (2) "set geotextile fabric and artificial grass turf/crumb rubber underneath the HDPE in a deliberate effort to prevent any rough material in the bypass channel from damaging the HDPE liner." Dkt. No. 71 at 2. Once diversions began, the liner failed almost immediately; "shortly after diversions into the temporary spillway began, the HDPE liner unexpectedly tore." *Id.* This was not a situation where the handling of pollutants was merely "incidental[]" to the initial peril, *Dolsen*, 264 F. Supp. 3d at 1093; rather, it is undisputed that Electron Hydro placed the eventual pollutants in the river to prevent damage to the HDPE liner, Dkt. No. 71 at 2. Because the two events are "intimately tied," the tear in the liner cannot be characterized as an entirely separate event that has no relation to the alleged discharge of pollutants at issue in this case. *See Dolsen*, 264 F. Supp. 3d at 1094; *see also Country Mut. Ins. Co. v. Jackson*, No. 2:20-CV-00150-SAB, 2022 WL 187808, at *8 (E.D. Wash. Jan. 20, 2022) (determining that explosion of metal cylinder that, unbeknownst to policyholders, contained pressurized chlorine gas was not covered by insurance policy with pollution exclusion because the initial event was the agreement to dispose of the cylinder, even if policyholders did not know cylinder's contents).

Furthermore, "the purpose of the efficient proximate cause rule is to provide a workable rule of coverage that provides a fair result within the reasonable expectations of both the insured and the insurer"; it does not supplant "the intentions and expectations of the parties[.]" *Kish*, 883 P.2d at 312; *see also Graham v. Pub. Emps. Mut. Ins. Co.*, 656 P.2d 1077, 1081 (Wash. 1983) (adopting the efficient proximate cause rule so as to "allow inquiry into the intent and expectations

of the parties to the insurance contract"). With this principle in mind, the Court finds that the plain language of the Policy already addresses coverage when pollution is caused by an "accident[.]" Specifically, save for certain exceptions (e.g., clean up costs, fines, or penalties), property damage caused by pollution is covered if, among other things, "[i]t was accidental and neither expected nor intended by the insured." Dkt. No. 59 at 69. Thus, the Policy expressly reflects the parties' intentions and expectations regarding coverage for pollution in the event of an accidental, unexpected, and unintended event such as the tear in the liner. *See Findlay v. United Pac. Ins. Co.*, 895 P.2d 32, 35 (Wash. Ct. App. 1995) (finding that policy "does not improperly circumvent the efficient proximate cause rule because its language and structure communicate an intent to exclude coverage when weather conditions combine with earth movement to cause a loss"; "the plain language of the provision clearly states that coverage for weather conditions is excluded except in certain circumstances and that coverage is always excluded when weather conditions and earth movement act together").

For these reasons, the Court denies Defendants' motion for summary judgment that coverage is warranted under the efficient proximate cause rule.

## G.    Fees Under *Olympic Steamship*

Defendants ask the Court to award them fees under *Olympic Steamship Co. v. Centennial Insurance Co.*, 811 P.2d 673 (Wash. 1991). Dkt. No. 70 at 25–26. Entitlement to fees under *Olympic Steamship* depends on whether, and to what extent, Thomas Miller compelled Defendants to assume the burden of litigation to obtain the full benefit of its policy. The Court defers ruling on Defendants' request until the remaining substantive issues in this case are resolved.

## III.    CONCLUSION

For the foregoing reasons, the Court DENIES Thomas Miller's motion for summary judgment, Dkt. No. 67, and GRANTS IN PART and DENIES IN PART Defendants' cross-motion

for summary judgment, Dkt. No. 70. The Court further ORDERS the parties to meet and confer and, within 30 days of the date of this Order, submit to the Court a joint status report setting forth a proposal regarding disposition of the remaining issues in this case.

Dated this 8th day of May, 2025.

Lauren King
United States District Judge